**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel:    (212) 237-1000
Fax:    (212) 262-1215
Charles E. Simpson (csimpson@windelsmarx.com)
David Lopez (dlopez@windelsmarx.com)

*Attorneys for Joint Debtors and Debtors-In-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                                        :
                                                              :        Chapter 11 Case
OWENS FUNERAL HOME,                                           :
INCORPORATED, et al.,                                         :        No. 20-10508 (DSJ)
                                                              :
                            Debtors.                          :        (Jointly Administered)
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ENTRY OF A FINAL ORDER**
**(I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION**
**SECURED, SUPERPRIORITY FINANCING PURSUANT TO**
**11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND (II) SCHEDULING A**
**FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)**

**TO:    HONORABLE DAVID S. JONES,**
**UNITED STATES BANKRUPTCY JUDGE:**

Owens Funeral Home, Inc., the Debtor-In-Possession (the "Debtor") and the affiliated

Debtors and Debtors-In-Possession (collectively, the "Debtors")[1] in the above-captioned cases,

hereby submit this motion (the "Motion") for a final order ("Final DIP Order")[2]:

> (a)    authorizing the Debtors pursuant to sections 105(a) and 364(c) and (d) of
> the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014, to,
> inter alia, obtain from Legalist Fund I, LP (as lender, agent, and collateral
> agent, the "DIP Lender"), a senior secured super-priority debtor-in-

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Isaiah Owens, LLC (4987), Owens Transportation Excellence, Inc. (7830), and Isaiah Owens, Individually (8478). The service address for each of the above Debtors is 216 Lenox Avenue, New York, New York 10027.

[2]  Capitalized terms used but not defined herein have the meaning given to them in the DIP Facility Credit Agreement, attached hereto as Exhibit "A".

possession credit facility with a commitment amount equal to One Million Seven Hundred Fifty Thousand ($1,750,000.00) Dollars (the "DIP Facility"), in accordance with the credit agreement (the "DIP Facility Credit Agreement") annexed hereto as **Exhibit "A"**. The DIP Facility shall be used to rehabilitate the Debtor's Property and operate the Debtors' business and to pay administrative fees, costs, and expenses related to the Bankruptcy Cases, including, without limitation, payments with respect to the Carveout, and for such other purposes in accordance with the budget annexed hereto as **Exhibit "B"** (the "Budget"), and not otherwise prohibited under the DIP Facility Loan Agreement;

b)      authorizing the Debtors to execute and deliver the DIP Facility Credit Agreement and to perform such other and further acts as may be necessary and appropriate in connection therewith, pursuant to the DIP Facility Credit Agreement;

c)      entering the Final DIP Order, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, to provide that the obligations of the Debtors to the DIP Lender under the DIP Facility Credit Agreement (the "DIP Obligations") (i) be granted allowed super-priority administrative expense status against each Debtor (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expense claims of any kind asserted against the Debtors, including, but not limited to, the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726(b), 1113 and 1114 of the Bankruptcy Code, subject only to the Carveout, (ii) subject only to the Carveout, be secured, (a) under section 364(d) of the Bankruptcy Code, by fully perfected priming first-priority security interest in all existing and after acquired real and personal, tangible and intangible, assets of the Debtors, including all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, causes of action, and all substitutions, accessions, and proceeds of the foregoing, wherever located, including insurance or other proceeds (collectively, the "Post-Petition Collateral"); (b) under section 364(c)(2) of the Bankruptcy Code, by perfected first priority, senior security interests in and liens on all of the Post-Petition Collateral; and (c) under section 364(c)(3) of the Bankruptcy Code, by junior priority, perfected security interests in and liens on all of the Debtors' currently owned and after acquired encumbered property (collectively, the "Post-Petition Liens"); and

d)    scheduling, pursuant to Bankruptcy Rule 4001, a hearing (the "<u>Final Hearing</u>") to consider entry of the Final DIP Order to obtain, on a final basis, the DIP Facility, pursuant to the DIP Facility Credit Agreement.

In support of this Motion, the Debtors respectfully represent and set forth as follows:

## PRELIMINARY STATEMENT

1.    The Debtors have insufficient funds to meet their pre-petition debts and operating and liquidity needs and urgently require post-petition DIP financing, which would be made available under the DIP Facility, in order to maintain business operations, pay certain obligations, rehabilitate the Debtors' real property located at 216 Lenox Avenue, New York, New York (the "<u>Property</u>"), and preserve the business and assets of the estate. The Debtors seek to rehabilitate the Property in order to increase the Property's current market value and refinance the Property in order to pay each class of creditors holding allowed claims in full.

2.    If the Debtors are unable to obtain sufficient liquidity and therefore to maintain their operations, as well as relationships with their patients, suppliers, and employees, the Debtors' business will be disrupted resulting in permanent and irreplaceable losses to the Debtors' estates, creditors and all parties in interest.

3.    The proposed rehabilitation of the Property will transform the vacant residential portion of the Property into two (2) and three (3) bedroom residential units, each with an estimated fair market value of approximately $900,000.00 and $1,200,000.00, respectively.

4.    The rehabilitation will increase the "as is" value of the Property from approximately $3,230,000.00 to an estimated $6,000,000.00 to $8,000,000.00. Upon completion of the rehabilitation project ("<u>Rehabilitation Project</u>"), which the Debtors anticipate will take approximately twelve (12) to eighteen (18) months, the Debtors will refinance the Property in

order to pay off the DIP Lender and the existing mortgage on the Property held by secured creditor, 216 Lenox Avenue Funding, Inc. ("216 Lenox").

5.      As of April 6, 2021, 216 Lenox holds a claim secured by a first priority mortgage against the Property in the sum of approximately $1,877,093.13.  Since the filing of the Chapter 11 Cases (defined below), the Debtors have been making Adequate Protection Payments (defined below) to 216 Lenox.  Under the Proposed Chapter 11 Plan, the Debtors shall continue making Adequate Protection Payments (defined below) to 216 Lenox.

6.      Pursuant to the "SO ORDERED" Stipulation and Agreed Order, dated November 17, 2020 (the "Stipulation") [Docket No. 47], and amended on April 12, 2021 (the "Amended Stipulation") [Docket No. 70], the Debtors are currently making monthly adequate protection payments to 216 Lenox in the sum of $15,778.09 ("Adequate Protection Payment").  For the duration of the Rehabilitation Project, the Debtors shall continue making those Adequate Protection Payments to 216 Lenox.  A sale of the Property would essentially force the Debtors out of business to the detriment of its secured and unsecured creditors

7.      If the Debtors are unable to obtain the DIP Facility and, therefore, rehabilitate and retain ownership of the Property in order to continue operating their business, the Debtors' business will be disrupted resulting in permanent and irreplaceable losses to the Debtors' estates, creditors and all parties in interest.

8.      In connection with the planning for these Chapter 11 Cases (defined below), the Debtors searched for alternative sources of post-petition debtor-in-possession financing. The Debtors were unable to obtain DIP financing in the form of unsecured credit repayable as an administrative expense.  The Debtors' efforts to obtain DIP Financing were further delayed by the impact of COVID-19.

9.      After continued searching for DIP funding post-petition, and a careful review and deliberation, the Debtors determined in their business judgment that the proposal from the DIP Lender was the only viable option for DIP financing available to the Debtors that would satisfy their working capital needs and provide for payment of necessary costs and expenses related to the Chapter 11 Cases, including the Carveout.  Consequently, the Debtors engaged in good- faith and extensive arm's-length negotiations with the DIP Lender. These negotiations culminated in an agreement to provide the DIP Facility on the terms and subject to the conditions set forth in the DIP Facility Loan Agreement.

10.      The DIP Facility is critical to the Debtors' ongoing operations and restructuring efforts and therefore, the Debtors seek authorization from the Court to obtain the DIP Facility, in accordance with terms set forth in the DIP Facility Credit Agreement.

## JURISDICTION AND VENUE

11.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

12.      The statutory predicates for the relief requested herein are sections 105, 361, 363, 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## GENERAL BACKGROUND

13.      On February 18, 2020, Owens Funeral Home, Incorporated (the "Funeral Home"), Isaiah Owens, LLC (the "LLC") and Mr. Owens, Individually ("Mr. Owens" and collectively with the Funeral Home and the LLC, the "Initial Debtors"), filed voluntary petitions for relief under

chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

14.     On March 10, 2020 (the "Supplemental Petition Date"), Owens Transportation Excellence, Inc. ("Owens Transportation"), an affiliate of the Initial Debtors, commenced a Chapter 11 case (together with the Chapter 11 cases of the Initial Debtors, the "Chapter 11 Cases") by filing with the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' cases, and no creditors' committee has been appointed. The Chapter 11 Cases are jointly administered for procedural purposes only [Docket No. 29].

15.     Additional factual background relating to the Debtors' businesses and the commencement of the Chapter 11 Cases is set forth in detail in the Declaration of Isaiah Owens, dated April 22, 2020 (the "Owens Declaration") [Docket No. 17] and incorporated herein by reference.

## SUMMARY OF THE DEBTORS' PRE-PETITION DEBT STRUCTURE

16.     The Debtors' primary assets at filing were as follows:

a)     Cash: As of the Petition Date, the Debtors were holding cash in the sum of approximately $34,682.92.

b)     Accounts Receivable: As of the Petition Date, the Debtor had accounts receivable totaling approximately $15,526.12.  The Debtors believe that the value of a majority of the accounts receivable is collectible.

    c)      Other Assets: As of the Petition Date, the Debtors were holding inventory and other assets with an aggregate value (at cost) of approximately $1,105,947.11.[3]

    d)      Other Assets: As of the Supplemental Petition Date, Owens Transportation was holding seven (7) vehicles with an aggregate value of approximately $386,530.00.

17.     On January 19, 2018, 216 Lenox commenced a foreclosure action in the Supreme Court of the State of New York, County of New York, captioned *216 Lenox Ave. Funding, Inc. v. Isaiah Owens, LLC, et al.*, under Index No. 850011/2018 ("State Court Action"), to foreclose on the mortgage against the Property previously held by Carver Bank, and subsequently assigned to 216 Lenox (the "Mortgage"). Despite extensive motion practice due to 216 Lenox declaring a default on the Mortgage after the Mortgage had been assigned to 216 Lenox without notice to the Debtors and 216 Lenox's refusal to accept mortgage payments from the Debtor to cure the default, a Judgement of Foreclosure and Sale was entered by the Court on December 16, 2019, in the sum of $1,742,878.32.

18.     On July 17, 2020, 216 Lenox filed a claim ("Proof of Claim") in the Chapter 11 Case asserting a claim in the sum of $1,877,093.13 (See, Proof of Claim No. 12). On January 30, 2021, the Proof of Claim was amended to reflect an outstanding amount due to 216 Lenox in the total sum of $2,027,516.29. (See, Proof of Claim No. 17). 216 Lenox is the only creditor that asserts a security interest in the Property and substantially all of the Debtors' assets.

19.     216 Lenox also obtained cross-guaranties for the Mortgage from the Funeral Home and Mr. Owens, Individually.

---

[3] "Other Assets" consist of Pre-Arrangement Accounts with Cooperative Funding (See, Debtor's Schedule A/B, Part 11, Items 76-78).

## THE DIP FACILITY

A. **Debtors' Efforts to Obtain Post-Petition DIP Financing.**

20.      In connection with the planning for these cases, the Debtors determined they might require debtor in possession ("DIP") financing to meet their ongoing liquidity needs. Particularly, the Debtors sought to obtain a respite from 216 Lenox's precipitous efforts to foreclose on the Property.  Accordingly, prior to the Petition Date, the Debtors sought post-petition DIP financing and contacted a number of lending institutions, but were unsuccessful in obtaining such financing.

21.      More recently, in the post-petition period, the Debtors made additional attempts to obtain DIP financing and ultimately received several initial proposals from lending institutions, including hard money lenders.[4]   Discussions with lending institutions were severely delayed due to the impact of COVID-19.   After review and deliberation, the Debtors concluded that the proposal from the DIP Lender is in the Debtors' best interests and was the only viable option for DIP financing available to the Debtors that would satisfy working capital needs and provide for payment of necessary costs and expenses related to these cases.

22.      The Debtors have insufficient funds to rehabilitate the Property and to meet their operating and liquidity needs and urgently require the funds and working capital to be provided by the DIP Lender to complete the rehabilitation, to carry on their business operations, to pay transaction costs, fees, and expenses, which will be incurred in connection with these Bankruptcy Cases.

---

[4] The Debtors spoke with hard money lender, WE LEND and discussed the terms of a hard money loan.  After week of negotiations, the Debtors and WE LEND could not agree on the terms of the hard money loan.  All negotiations with WE LEND were terminated.  Discussions were also had with a hard money lender who proposed a "Lease Buy Back" Option to secure a hard money loan.  After discussions with the Debtors and counsel, those negotiations were also terminated.

23.     The Debtors' ability to maintain relationships with their customers and the community in Harlem and business relationships with its suppliers, to pay its employees, to purchase new inventory and otherwise finance their operations, is dependent on its ability to obtain the funds that would be made available under the DIP Facility.

24.     Any disruption of the Debtors' operations would be devastating at this critical juncture. The Debtors' inability to obtain sufficient liquidity and to make payments on certain obligations on a timely basis would result in a permanent and irreplaceable loss of business, causing a loss of value to the detriment of the Debtors and their estates.

25.     In light of the foregoing, the Debtors determined in their business judgment that the (i) DIP Facility is critical to their ongoing operations in the ordinary course of business and (ii) that the DIP financing proposed by the DIP Lender is the best source of financing available to the Debtors under the current circumstances.

26.     The Debtors, therefore, seek authorization from the Court to obtain necessary DIP funding under the DIP Facility, in accordance with the terms set forth in the DIP Facility Loan Agreement.

**B.     The DIP Facility Loan Agreement**

27.     As described in greater detail in the DIP Facility Loan Agreement, the DIP Facility principally is designed to provide the Debtors with necessary capital to continue operations, to rehabilitate the Property and to fund a proposed Chapter 11 Plan.

28.     The Debtors' ability to access funds under the DIP Facility is subject to the Budget, which represents the Debtors' best good faith estimates of the timing to complete the Rehabilitation Project and the amounts and timing of anticipated receipts and disbursements during

the Budget period based upon (i) continuation and completion of the ongoing restructuring efforts,

(ii) the availability of funds under the DIP Facility, and (iii) certain economic assumptions.

29.     The Debtors engaged in good-faith and extensive arm's-length negotiations with

the DIP Lender. These negotiations culminated in an agreement with the DIP Lender to provide

the DIP Facility on the terms and subject to the conditions set forth in the DIP Facility Loan

Agreement and the Final DIP Order.[5]  The significant terms of the DIP Facility Loan Agreement

and the Final DIP Order are as follows:[6]

| Overview | The DIP Loans shall be made to the Debtors in the aggregate amount of the DIP Commitment. The Debtors shall use the proceeds of the DIP Loans solely for agreed-on uses. |
|---|---|
| **Conditions Precedent to DIP Draw** | The DIP Lender will make available up to the DIP Commitment in DIP Loans to the Debtors in one or more draws (each a "DIP Draw"), provided no event of default shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom, upon occurrence of all of: <br> 1.  The DIP Lender's completion, to its own satisfaction, of any remaining due diligence; <br> 2.  The Debtors' delivery of a fully executed credit agreement in Approved Form (the "DIP Loan Agreement");[7] <br> 3.  The Bankruptcy Court's entry of a final financing order consistent in all regards with this Term Sheet and otherwise in Approved Form (the "DIP Order"), which remains in full force and effect as so entered; <br> 4.  The Debtors' satisfaction of all applicable case milestones; and <br> 5.  The Debtors' delivery of an executed borrowing request in Approved Form (a "Borrowing Request") in the amount of the DIP Draw. |
| **Interest, Default Interest, and Undrawn Line Fee** | The outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue paid-in-kind interest from the Effective Date at the U.S. prime rate (subject to a 4.00% floor) plus 11.75% per year. In the event a default has occurred and is continuing, such amounts shall accrue an additional 4.75% in interest per year. Any undrawn portion of the DIP Commitment shall accrue a fee (the "Undrawn Line |

---

[5]  The proposed Final DIP Order will be filed under separate cover.

[6]  This summary is qualified in its entirety by reference to the Term Sheet and provisions of the DIP Facility Agreement.

[7] "Approved Form" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

| | |
|---|---|
| | Fee") from the Effective Date at 4.75% per year. All such interest and fees shall accrue and be compounded and capitalized monthly and be due and payable in cash upon the Maturity Date. |
| **Other Costs of Borrowing** | A onetime "Commitment Fee" of 2.75% of the DIP Commitment and a onetime "Underwriting Fee" of 1.75% of the DIP Commitment shall be deemed fully and irrevocably earned upon the Effective Date. In addition, a "Monitoring Fee" of 1.75% of the DIP Commitment per year, shall accrue and be compounded and capitalized monthly. All such fees shall be due and payable in cash upon the Maturity Date. |
| **Mandatory Prepayments** | The DIP Loans shall be mandatorily repaid to the extent of, and within 10 business days of the Debtors' receipt of, any net proceeds from the sale or other disposition of any DIP Collateral; provided that no such sale or disposition shall occur without the DIP Lender's prior written consent or other than in Approved Form; provided further that any such repayment required to be made prior to 365 days after the Effective Date shall be accompanied by an additional fee of 4.75% of the amount required to be repaid (a "Makewhole Fee"). |
| **Voluntary Prepayments** | The DIP Loans may be voluntarily repaid prior to the Maturity Date beginning 180 days after the Effective Date, in the minimum amount of $50,000, subject to contemporaneous payment of the applicable Makewhole Fee. |
| **Maturity Date** | The DIP Loans shall mature, and all unpaid DIP Obligations shall be due and payable (the "Maturity Date"), upon the earliest of (i) 548 days after the Effective Date, (ii) repayment in full of all outstanding DIP Loans, (iii) satisfaction of the last case milestone; and (iv) acceleration of the DIP Loans following an event of default; provided that, solely under clause (i) above, such Maturity Date may be extended by the Debtors (prior to the occurrence thereof) by up to six months; provided further that interest shall accrue at the default rate provided herein during such extended period. |
| **Superpriority Claims and DIP Liens** | All DIP Obligations shall, pursuant to Bankruptcy Code section 364(c)(1), constitute DIP Claims,[8] payable from and having recourse to all DIP Collateral and all other property of the Debtors' estates. Each Debtor shall pledge, and grant the DIP Lender liens on its respective DIP Collateral (collectively, the "DIP Liens"), with all DIP Obligations secured by automatically perfected DIP Liens, senior to all pre- and postpetition liens, on all DIP Collateral. |

---

[8] "DIP Claims" means "superpriority" administrative-expense claims with priority over (i) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code (subject to the Carveout (defined below)) and (ii) all other unsecured claims against the Debtors.

| | |
|---|---|
| **DIP Collateral** | The DIP Loans shall be secured by DIP Liens on all assets and properties, whether real, personal, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that any Debtor now owns or hereafter acquires, or to or in which any Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, or otherwise), together with (in each case) all proceeds thereof (collectively, the "<u>DIP Collateral</u>"). |
| **Budget and Reporting** | Prior to the Effective Date, the Debtors shall deliver a budget encompassing, on a weekly basis, the period from the Effective Date through the satisfaction of the final Milestone and containing detailed line items of the Debtors' projected receipts and disbursements, in Approved Form, subject to customary reporting and variances. |
| **Break-Up Fee** | In the event that, after execution of this Term Sheet, the transactions contemplated hereby should not be timely effected for any reason, including (without limitation) any Debtor accepts alternative postpetition financing from any other source or, in lieu of postpetition financing, enters into any other transaction (of any kind whatsoever) with any other party to fund its Case – in each case, as evidenced by a letter of intent, proposal letter, commitment letter, or otherwise – the DIP Lender shall be immediately (and without any further action by or notice to any party) be entitled to a fee of 4.75% of the DIP Commitment plus any and all costs of collection (including fees of outside counsel) with respect thereto (collectively, the "<u>Break-Up Fee</u>"), which Break-Up Fee shall accrue interest from the date so triggered until actually paid to the DIP Lender at the default-interest rate provided herein (compounded monthly), payment shall in no case occur later than the earlier of (i) the anticipated closing of the transactions contemplated hereby and (ii) the closing of any alternative transaction.[9]  The Debtors shall be jointly and severally liable for any Break-Up Fee. |
| **DIP Lender Expenses; Other DIP Obligations** | The Debtors shall pay promptly, without notice to or approval of any third party (including the Bankruptcy Court) all costs and expenses of the DIP Lender incurred in connection with, arising from, or relating to any Debtor or its Case, the DIP Loans, and any exercise of rights or remedies (expressly including all collection efforts), whether incurred before or after the date hereof, including (without limitation) all fees, expenses, and disbursements of inhouse or outside counsel or any other advisor employed or retained by the DIP Lender with respect thereto (collectively, the "<u>DIP Lender</u> |

---

[9] By executing this Term Sheet, each Debtor acknowledges that the Break-Up Fee is intended to and shall constitute an actual, necessary cost and/or expense of preserving its estate and, thus, entitled to priority under Bankruptcy Code section 503(b). The Debtors shall use best efforts, in the event the Break-Up Fee is triggered, to ensure the Break-Up Fee's allowance as an administrative-expense claim and prompt payment thereof (together with all interest thereon). Notwithstanding anything herein to the contrary, the Break-Up Fee shall be due and payable (if applicable) from and after execution of this Term Sheet by the Debtors, irrespective of the occurrence of the Effective Date.

|  | Expenses"). The DIP Lender Expenses, together with all principal of, and interest and fees on, the DIP Loans, together with any amount owed under any indemnity, and any other amount owed by any Debtor in connection therewith shall constitute "DIP Obligations," all of which shall be joint-and-several obligations of the Debtors. |
|---|---|
| **Miscellaneous Provisions** | Customary for postpetition financing of this kind or as otherwise reasonably required by the DIP Lender, including: <br> • Debtors' representations, warranties, and affirmative and negative covenants; <br> • Stay waiver (notwithstanding Bankruptcy Rule 6004); <br> • Indemnity of DIP Lender and its affiliates; <br> • Section 364(e) "good faith" findings in favor of the DIP Lender; <br> • Carveout (2.5% of DIP Loans post-default); <br> • Events of Default and DIP Lender's rights and remedies; and <br> • Governing Law (Bankruptcy Code / New York State). |

30.     The Debtors have made substantial efforts to secure alternative financing on an unsecured or other less stringent basis and have been unable to identify any DIP lender willing to make such advances for the reasons set forth herein. Consequently, the DIP Facility is the only available, necessary DIP funding for the Debtors.

## THE PROPOSED DIP FACILITY SHOULD BE AUTHORIZED

### A.     Approval Under Section 364(c) of the Bankruptcy Code

31.     The Debtors propose to obtain financing pursuant to the terms set forth in the DIP Facility Loan Agreement by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the Debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).

32.     Section 364(c) financing is appropriate when the trustee or debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc*., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *see also In re Aqua Assocs., L.P*., 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991).

33.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(i)      debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a DIP Lender only an administrative claim;

(ii)     credit transaction is necessary to preserve the assets of the estate; and

(iii)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed DIP lender.

*Ames Dep't Stores*, 115 B.R. at 37–39; *Aqua Assocs.,* 123 B.R. at 195–96.

34.     Each of the elements of the three-part test has been satisfied with respect to the relief requested. As set forth herein, the Debtors were not able to obtain financing on terms more favorable than set forth in the DIP Facility Loan Agreement. The DIP Facility is necessary to enable the Debtors to rehabilitate the Property, pay their debts and to continue to operate the business due to the lack of any other source of cash available to the Debtors.

35.     The terms of the DIP Facility are fair, reasonable, and adequate based on the circumstances that the proposed financing is the only viable option available to the Debtors to finance their working capital needs during these bankruptcy cases.

**B.      Section 364(d):  Priming Liens and Request for Adequate Protection**

36.      The Debtors are unable to obtain credit under the provisions of section 364(c) of

the Bankruptcy Code and are able to obtain only credit secured by a senior or equal lien on the

Post-Petition Collateral that is or may already be subject to a lien, commonly referred to as a

"priming lien." 11 U.S.C. § 364(d).

37.      Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of

postpetition debt secured by senior or "priming" liens, provides that the Court, after notice and a

hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal

lien on property of the estate that is subject to a lien if:

A.      the trustee is unable to obtain credit otherwise; and

B.      there is adequate protection of the interest of the holder of the lien on the property
of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

38.      In compliance with section 364 of the Bankruptcy Code, and consistent with the

purposes underlying the provision of adequate protection, the DIP Facility Loan Agreement and

the Final DIP Order provides that adequate protection will be provided to the Pre-Petition Lender,

in the form of the Pre-Petition Lender's Replacement Liens and Protections (as described above),

in connection with the proposed DIP Facility. *See, e.g., In re Mocco*, 176 B.R. 335, 348 (Bankr.

D.N.J. 1995) ("Adequate protection, as defined in [section] 361, is normally provided in the form

of cash payments (§ 361(1)), or a replacement lien (§ 361(2)), or the "indubitable equivalent of

such entity's interest in such property.").

39.      The Debtors are currently making monthly adequate protection payments to 216

Lenox in the sum of $15,778.09 ("Adequate Protection Payment").  Through confirmation of the

Joint Plan and for the duration of the Rehabilitation Project, the Debtors will continue making

Adequate Protection Payments to 216 Lenox until the Property is refinanced and 216 Lenox's pre-Petition claim is satisfied in full as to the obligations of the Debtors.

**C.    The Debtors Do Not Have an Alternative to the DIP Facility**

40.    A working DIP financing of the type needed in these cases could not have been obtained on an unsecured basis from any other lender on any other terms. Potential sources of DIP financing for the Debtors, obtainable on an expedited basis and on reasonable terms, were extremely limited under the circumstances, including the impact of COVID-19. In such circumstances, "[t]he statute imposes no duty to seek credit from every possible DIP Lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Say. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (finding that trustee demonstrated by good faith that credit was not available without senior lien by unsuccessfully contacting other financial institutions); *see also In re Ames Dep't Stores*, 115 B.R. at 37–40 (finding that debtor demonstrated the unavailability of unsecured financing where they approached several lending institutions).

41.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential DIP lenders by sections 364(e) and (d) of the Bankruptcy Code.  *Snowshoe*, 789 F.2d at 1088; *see also In re Antico Mfg. Co.*, 31 B.R. 103, 105 (Bankr. E.D.N.Y. 1983).

42.    Moreover, where, as here, there are only a few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

43.     The Debtors have not been able to obtain financing on terms more favorable than those under the DIP Facility Loan Agreement, and the evidence herein satisfies the requirement of sections 364(c) and (d) of the Bankruptcy Code.

**D.      Application of the Business Judgment Standard**

44.     As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtors, in consultation with their professionals, concluded that the DIP Facility is the only source of DIP funding available under the circumstances of these cases.

45.     Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is based on irrationality or inattention.  *See, In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").

46.     Indeed, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Thus, courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (footnote omitted).

47.     The Debtors have exercised sound business judgment in determining that the DIP Facility is fair and appropriate and have satisfied the legal prerequisites to borrow under the DIP

Facility Loan Agreement. The terms of the DIP Facility Loan Agreement are fair and reasonable under the circumstances and, as the only financing option available to the Debtors, and are in the best interests of the Debtors' estates and their creditors.

48.    Accordingly, the Debtors should be granted authority to enter into the DIP Facility Loan Agreement and to borrow funds from the DIP Lender on the secured, administrative, superpriority basis described herein, and to take the other actions contemplated by the DIP Facility Loan Agreement, as requested herein.

49.    Without the liquidity provided by the DIP Facility, the Debtors will be unable to pay suppliers, employees, and other constituencies that are essential to the orderly operation of the business. The Debtors' have exercised their best business judgment in negotiating the DIP Facility that is presently before the Court.

**E.    The DIP Facility Is Necessary to Preserve the Assets of the Debtors' Estates and to Operate the Debtors' Businesses**

50.    The Debtors' need for immediate access to a working capital facility is readily apparent. Access to the funds available under the DIP Facility is necessary to rehabilitate the Property and to meet the day-to- day costs associated with maintaining the Debtors' business and relationships with vendors suppliers, and employees, and otherwise with financing the Debtors' operations and paying expenses of the bankruptcy cases.

51.    Access to sufficient cash, therefore, is critical to the Debtors. In the absence of immediate access to cash and credit, the Debtors will be unable to operate the business and will be forced to shut down and sell the Property, which would seriously and permanently impair the Debtors' prospects for maximizing the value of their estates for all constituencies.

**F.**      **The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate**

52.      The Debtors are unable to obtain unsecured credit allowable solely as an Administrative Expense. In the Debtors' business judgment, the DIP Facility is the best financing option available under the present circumstances. The proposed terms of the DIP Facility are fair, reasonable, and adequate under the circumstances, and the purpose of the DIP Facility is to enable the Debtors, among other things, to meet ongoing operational expenses.

53.      The proposed DIP Facility provides that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve-Out, which contains an adequate carve-out for professional fees and expenses incurred in these Bankruptcy Cases. In *Ames Dep't Stores*, the bankruptcy court found that similar "carve-outs" are not only reasonable but also necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. *In re Ames Dep't Stores*, 115 B.R. at 40.

54.      Likewise, the various fees and charges required to be paid by the DIP Lender under the DIP Facility Loan Agreement are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize debtors to provide similar incentives to their post-petition DIP lenders, including those beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. *See, Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (authorizing credit arrangement under section 364, including a DIP Lender "enhancement fee");  *see also, In re Mid-State Raceway, Inc.*, 323 B.R. 40, 54 (Bankr. N.D.N.Y. 2005).

55.      The terms and conditions of the DIP Facility Loan Agreement are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Thus, the DIP

Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code with respect to the DIP Facility Loan Agreement.

## G.    Request for Modification of Automatic Stay

56.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition pursuant to the Bankruptcy Code. The proposed DIP Facility Loan Agreement contemplates a modification of the automatic stay (to the extent applicable), to permit the exercise of all rights and remedies provided for in the DIP Facility Loan Agreement upon the occurrence and during the continuation of any Event of Default. Stay modification provisions of this kind are ordinary and standard features of post-petition DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

## H.    [FINAL HEARING/FINAL ORDER]

57.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary, expedited hearing on the motion and to authorize a debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate pending a final hearing.

58.    In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985). After the 15-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business. A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. *See, e.g., Id.* at 449; *Ames Dep't Stores*, 115 B.R. at 36.

59.     Pending the Final DIP Hearing, the Debtors require immediate use of the DIP Facility in order to commence the rehabilitation of the Property, retain professional craftsmen and operate their business. It is essential that the Debtors immediately embark on the rehabilitation of the Property, stabilize their operations and resume paying for ordinary, post-petition operating expenses to minimize the damage caused by the Debtors' cash flow problems. If interim relief is not obtained, the Debtors' businesses and assets could be immediately and irreparably harmed and the Debtors' attempts to maximize value and to get reorganized under Chapter 11 will be jeopardized, to the detriment of the Debtors' estates, their creditors, and other parties in interest.

60.     Accordingly, pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that, pending the Final DIP Hearing, the Court enter the Interim DIP Order as soon as practicable approving the Debtors' request for authorization to obtain the Maximum Interim Borrowing Amount, in accordance with and pursuant to the terms and conditions contained in the DIP Facility Loan Agreement.

## THE DIP FACILITY SHOULD BE AFORDED THE BENEFITS OF SECTION 364(E)

61.     Because the Debtors, in consultation with their professionals, negotiated the DIP Facility in good faith and at arm's length and because no consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Facility, other than as disclosed in the DIP Facility Loan Agreement, the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

## NOTICE

62.     The Debtors have provided notice of this Motion to: (i) the Office of the United States Trustee; (ii) the entities listed on each Debtors' List of Creditors Holding the Twenty (20)

Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) the Secured Lender, 216 Lenox Ave. Funding, Inc. (Attn: Stephen B. McNally, Esq.); (iv) counsel for 216 Lenox Ave. Funding, Inc., McNally & Associates, L.L.C. Attn: Stephen McNally, Esq., 93 Main Street, Newton, New Jersey 07860; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern District of New York; (vii) counsel for TCF Equipment Finance, Law Offices of Charles A. Gruen, Attn: Charles Gruen, Esq., 381 Broadway. Suite 300, Westwood, New Jersey 07675; (viii) the DIP Lender (dip@legalist.com); and (ix) any parties required to be served under any applicable Bankruptcy Rule or Local Rule. The Debtors respectfully submit that such notice is sufficient and that no further notice need be given.

**WHEREFORE**, the Debtors respectfully request that the Court enter a final order that grant the relief requested herein and such other and further relief as is just and proper.

Dated: May 3, 2021
      New York, New York

Respectfully submitted,

**WINDELS MARX LANE & MITTENDORF, LLP**

By: /s/ Charles E. Simpson
      Charles E. Simpson
      A Member of the Firm

156 West 56th Street
New York, New York 10019
Telephone: (212) 237-1000
Facsimile:  (212) 262-1215
Email: csimpson@windelsmarx.com

*Attorneys for the Debtor and*
*the Debtors-in-Possession*